The next case is Antic v. City of New York. May it please the Court, my name is Norman Ulch, Counsel for the Appellant. Viewed in a light most favorable to the Appellant, whether there was arguable probable cause to arrest the Appellant is a matter or is a question that should have gone to the jury in this case and not been resolved on summary judgment. The basic position of the appellee in this case is that Officer O'Sullivan was trying to handcuff a teammate of the Appellant. When the Appellant came up behind him, said nothing, grabbed his shoulder, at which point the Officer then turned around and sort of pushed him away, an event that lasted maybe about two seconds or so. But as the District Court recognized, if you view the evidence in a light most favorable to the Appellant, there's a very different story. And the story was, one, is that Patrolman Sullivan was not involved in any way in physically trying to arrest the Appellant's teammate. That the Appellant simply tapped the Officer on the shoulder and politely asked him, in effect, what's going on? Why is my teammate in this situation? And that this entire episode lasted about two seconds and that there was no practical, neither an intentional nor practical effort to interfere with, thwart, impede, or obstruct the arrest of the teammate. And under these circumstances, and one of the points that the District Court kept coming back to, is we don't really know what Patrolman O'Sullivan was doing. Because there were so many different officers who had different points of view, including O'Sullivan himself, who claimed that he was actually trying to put the handcuffs on, but other fellow- Your client testified during his deposition that at the time he intervened, Officer O'Sullivan was dealing with his friend who was- He said he was dealing with him, but that's contradicted by what other police officers said. I'm not sure what that meant when he said he's dealing with him. I don't think that I would draw from that that he was trying to handcuff him. I think there's no dispute that O'Sullivan was there. Isn't it clear that the officers were trying to move everybody in the direction of 10th Avenue, I think it is, and the two teammates were moving in the other direction? No, no, no, that's not correct. I mean, the event was that there had been a stabbing outside this nightclub or club, of which these parties had nothing to do with, and that the police then directed that the nightclub be evacuated, in a sense, or emptied, and that when everyone came out of the nightclub, the police then directed everybody go to the right to 10th Avenue, which the appellant did and his teammate did. Everybody went to the right. These events happened on 10th Avenue, so there's no question that everybody was moving in a different direction. The teammate stopped and wanted to give some money to a homeless person and stopped, and then your client came back when the... No, I don't believe that is correct, Your Honor. What happened was that when they got to 10th Avenue, Mr. Antic got into the Uber car and was sitting there, and then he looked up and he noticed that the police and his teammates seemed to be wrestling or grappling with each other. What was disclosed by other testimony, by the teammate's testimony, is that as he was about to get into the Uber car, someone he characterized as homeless, the police officer said, a man down on his luck, but somebody asked him for money, and that the teammate then reached out to give him the money, and perhaps the police interpreted that reaching out is some sort of aggressive... I think misinterpreted as something aggressive, but there was no... Mr. Antic was not involved in that. When Mr. Antic then saw the grappling going on in the front of the car, he got out of the car. No one told him not to get out of the car. He walked over. No one told him to stop. The question is whether a policeman might reasonably think that what your client did was violate the order to disperse, even though he was just barely coming out of a car, according to his story, to tell his pal, stop it. And that, you know, might give rise to possible probable cause because they might have fought that. My problem with that is that there is no claim whatever that they arrested him for doing that. The claim that they arrested him has to do with what he did, whether he touched or did not. So if they were to arrest him for not following the order to disperse, you'd think they would have done it right away. And instead, the claim is they didn't arrest me until I asked what was going on. And that's a little different, even if they could have arrested him for violating the for their thinking that he was violating the order to disperse. I agree with your characterization up to one point. I mean, he did leave the nightclub. He did leave. Yes, he did. He did. He did. And clearly the direction was go to 10th Avenue. He was on 10th Avenue. Can I just ask a question about that? Because I've looked at the video in the record several times. So he is, the Uber is then on 10th Avenue? Yes, the Uber is on 10th Avenue. That is correct. And the scuffle that is evident on the video, is that, where is that? That is on 10th Avenue. Down the street on 10th Avenue? On 10th Avenue, yes, on 10th Avenue towards the front of the car, yes. All right. But the car is on. Mr. Antic, in fact, testified that he called for the Uber car. Once they left, he called and he went in and he sat in the car and was looking at his cell phone and looked up and saw the grappling and then got out. I don't believe, though, that they didn't arrest him for leaving. The complaint says he disobeyed an order. The only order was to leave the nightclub and to go to 10th Avenue, which he did. And the fact, I think, Your Honor, is correct. He's sitting in the Uber car suggests that he complied with that order. Instead, what the argument is, is that the tap on the shoulder, asking, hey, what's going on with my teammate, constitutes obstruction of governmental administration. And I would submit that that is simply not so. Not only do we have the conflicting accounts of what happened, but the event that's as to what happened then. Correct. I think there is a question of fact. And I think the district judge acknowledged that. The district judge kept acknowledging, said, well, we go through all of this. What exactly was O'Sullivan doing? I mean, how can you say he obstructed O'Sullivan if we don't even know what he was doing? And I think, in my view, where the district judge went wrong was granting some judgment, but at the same time acknowledging that we don't really know what was going on here because there's so many different versions, different perspectives. Correct me if I misunderstand your record. You do know that O'Sullivan is in the midst of this. He's close to the action of the scuffle. You mean Petrone O'Sullivan? O'Sullivan. Yes, he's close to. He's intervened. When your client intervenes, O'Sullivan is one of the officers that is in close proximity to this. That is correct. To the arrest that's taking place. Right. But he is not, as the district judge acknowledges, there's no evidence to support. Well, this is his own testimony, but the record does not support the notion that O'Sullivan was actually physically trying to put the handcuffs on. Because remember what Mr. Petrone O'Sullivan's argument is. His argument is I was physically trying to put the handcuffs on the teammate. This man taps me on the shoulder, so that momentarily diverted my attention from what I was doing. But as the district court said, well, that's not entirely clear that you were even putting the handcuffs on him. Yes, he was standing there in close proximity, but the charge here is that he interfered with something. And the question, obviously, is what did he interfere with? What exactly was the interference? And as this court has indicated, and certainly a number of district court cases that I've cited in my brief, the very brevity of the situation, which is, according to Officer O'Sullivan, in about two seconds, just raises the question, was this really interference? Your point has to be broader, that somehow, if simply asking what is going on, and perhaps even touching a policeman politely, which is alleged, I'm not saying that it didn't happen, is enough to interfere, then that is something that has to be wrong. That citizens have to be able to ask police what is going on without, by doing that, risking being jailed. Yeah, I would agree with that. I mean, this is not a situation, which there are other cases, where people actually physically jump on the police officer and so on and so forth. It's not like that. He acknowledges touching his shoulder. The officer testified he grabbed me, and that's a question of fact, which the district judge could not resolve one way or the other, which I think is correct. You can't resolve that. But ultimately, I think, is the brevity of the situation. Interference requires that there be something that has been interfered with, and I don't think these facts here demonstrate, as a matter of law, that, as Your Honor suggested, asking an officer what's going on, and simultaneously, which many people do, some people tend to talk a little bit by tapping somebody, becomes a crime. And I think that that's a question that should be left for the jury and should not have been decided as a matter of law. I would also suggest, Your Honor, that in addition to the question of brevity, the question is, I realize the Supreme Court has not made clear what's meant by clearly established law in this area, other than their own pronouncements, but certainly from the point of view of New York law, which the Supreme Court may never really get to address, New York law makes clear that this is not obstruction of governmental administration. I mean, the New York Court of Appeals has made absolutely clear that simply a verbal remark to a police officer cannot be that. All of the cases in New York really deal with people assaulting police officers, jumping on them, or disobeying in order to stand back. In this case, as I've argued in my brief, when the patrolman pushed him, I would treat that as the functional equivalent of standing back. And he sat down, and everyone agrees that he never got up again. He obeyed the police order to stand back. It was perhaps a more aggressive way of doing it, but he stood back. So this is not a case of a person going beyond asking a question and then obeying the order of the police officer to stand back. And I would say, as a matter of law, we cannot say that police officers would conclude that this is, in fact, a question of obstruction of governmental administration. It should have been left to the jury to sort out what, in fact, was going on. Thank you. Okay, thank you very much. May it please the Court, Max McCann on behalf of Appellees. There is no question of fact here about what Officer O'Sullivan was doing when Antich approached him from behind and made physical contact. To be clear, everyone agrees that O'Sullivan was either arresting Antich or assisting in the arrest of Antich. And either one of those acts is sufficient to satisfy a conviction, let alone probable cause, and the even lower qualified immunity question for obstruction of governmental administration. If there is any evidence on the facts taken most favorably to appellate, that he was obstructing. Of course, if he was obstructing, there's no question. But the question is, taking the facts as he says them, that he came, he tapped an officer on the shoulder and asked what was going on while the officer was handcuffing somebody, taking that that way. Is that obstructing? And if that is obstructing, what is a citizen who is there and looking after someone allowed to do, for heaven's sakes? Yeah, one thing that's important to remember, we don't need actual obstruction. I understand. You need to have a policeman thinking that there is obstruction. And what I'm asking is, do the police have a right to think that when somebody comes along and politely taps him on the shoulder, again, I'm not saying that that's what happened, and asks what is going on, that that is obstruction. Because if that is what the police are allowed to think, we are in a very bad way. That's right, Your Honor. And if this occurred in a vacuum where we were perhaps Nothing occurs in a vacuum. Of course, right. Then perhaps that would not be probable cause or qualified immunity. But here we have a crime scene, a stabbing outside of a nightclub at 4 a.m. in the morning. We have a scuffle between a large suspect who's actively resisting arrest and reaching for his waistband. And we have Officer O'Sullivan who's undoubtedly standing within one to two feet of this struggle between Sefa Lucia and the police officers. And then we have Antich who rushes up behind Officer O'Sullivan, taps him on the shoulder. We don't know whether he was rushing up. All we know on the facts most favorable to him is that he tapped him on the shoulder and asked what was going on. And I understand that it was a crime scene. There are terrible crime scenes. There are bad crime scenes or whatever. But the question is, does a policeman in a situation like that have probable cause to think that somebody is obstructing justice if they ask something politely? Now, you know, I think it is extremely likely that a jury will find that the facts were not that way. But it comes back to that. I mean, if you're arguing that because there was a very bad crime scene, simply asking what is going on is troubling to me. Is that the argument? No, Your Honor. To be clear, it's not. We have a large suspect approaching a police officer from behind and making physical contact and diverting that officer. You mean it's a matter of size? It can be. If I do it, it's not? It can be. Be careful, because when you're saying size, you're really saying other things as well. Your Honor. Aren't you? No, Your Honor. I'm saying size. I'm saying that whether a suspect is physically imposing can bear on whether a reasonable officer would feel threatened, which is one of the characteristics of obstruction of governmental administration. Doesn't your argument have to be that there's arguable probable cause that this is interfering when police officers are engaged in a physical altercation with an arrestee, a person to be arrested who is resisting, a dangerous situation where the police officer's obligation is to have the person arrested with a reasonable use of force, minimal amount of force that can be employed, and that things that would be non-interference in other circumstance, walking up to an officer who's standing on a corner and saying, what's going on with these parking regulations? Not interference, but lower levels of interference constitute obstruction given the surrounding circumstance. Absolutely. We have to consider the circumstances of this case. This is not ordinary, everyday behavior. I think the stronger argument is not just the circumstances of the case, but in general, but in a situation in which the officers have said disperse, and then somebody who actually had dispersed, but where the officer might think that he had not dispersed and then does that, that that might make the circumstance. That's a much narrower argument than where you were. He says, I had dispersed. I wasn't even coming back. But the question has to be, would an officer in that situation think that there was that violation, and because he thought that there was that violation, thought that the person might be? That's a good distinction, Your Honor. And I'll first say to that, no, the officers didn't specifically order Antich to stand back from the arrest of Sefalusha because they didn't have time to. And we know that he rushed into the scene of this physical struggle because the video that's at 247 of the appendix confirms that. It's grainy, but it's surveillance video, and a criminal defense witness has done us the favor of imposing circles around the suspects. And you do see Antich insert himself into the physical struggle with Sefalusha. This video has to be watched before anybody can adjudicate the facts of this case. It's not a polite tap on the shoulder as if he's asking for directions. And to be perfectly clear, the officers did order Antich to leave this corner, not just the area of the nightclub. We've cited a string of record sites in our brief, but I'll specifically point the court to 228 where Officer Giacona says that he was removing people from the corner. I'll point the courts to Officer Colon, I'm sorry, not officer, a woman, Colon, who was with the officers at the time, she said that officers instructed them to leave the corner. That's 358 of the appendix. So we do have this order to leave. But more importantly, New York OGA cases don't require an order to stand back. It absolutely would be a better case for us if they did, but New York courts do not require that. For example, People v. Dolan and People v. Tarver, appellate division, the third department, affirmed convictions for OGA where there were no orders to stand back. You have just a threatening approach of a police officer from behind in People v. Tarver, and in People v. Dolan, you have sending marked police cars to the scene of an undercover operation. Yeah, but those are all situations where they find facts where there was threatening. That's a different, you know, sure, if there is that, then that's enough to have a proper arrest. Well, that's enough conviction. Right. And that's enough for a conviction, Your Honor. But more importantly, it's the absence of authority on point that shows that an arrest under these circumstances is unlawful that confirms the appropriateness of qualified immunity here. It's not enough to simply distinguish existing case law and say, well, this isn't that case, which, by the way, I don't think you can even do neatly, especially with Husbands v. City of New York, where somebody just approached the arrest of another person and was arrested and qualified immunity was applied there by the district court correctly. Here, the policy rationale for qualified immunity is really at its apex when you consider the circumstances here. Are you saying to me that because there is no case which says, when I say to an officer, what's going on, that that is, and I'm arrested, that that is improper, that there would be probable that qualified immunity would occur when an officer did that? The Supreme Court has made clear that in order to deprive qualified immunity, existing authority must place the unlawfulness of the arrest beyond debate. The fact that we are sitting here having this conversation itself proves that qualified immunity is appropriate because it's not fair to hold police officers liable for money damages where lawyers or judges or constitutional scholars could debate the merits of this argument. These officers are making split second decisions in a tense situation, applying very difficult legal authority in order to make this arrest. And that's why I just made an argument as to why the great judge Weinstein is the great judge Weinstein. Well, in that case, thank you, Your Honor. We'd ask this court to affirm. First of all, this was not a split second decision. He was on the ground. They initially arrested him for menacing. They then changed it. And the initial police report said he tried to punch the officer. I mean, all kinds of things that didn't happen. They charged him with menacing. He was actually threatening the officer. That charge disappears. So this was not a split second decision as to whether an officer should or should not arrest him. They thought this through. There are lots of police reports in terms of whether he tried to grab him, whether he tried to hit him, whether he tried to threaten him, et cetera. So this was not police officers having to make a split second decision. They took him into custody, but they could have then decided not to charge him with menacing. And, indeed, there's testimony from one of the officers that he didn't want to charge him with menacing, but that his supervisor told him that he had to, but charging with menacing, et cetera. In terms of existing authority, there's no United States Supreme Court case which has interpreted the obstruction of governmental administration, but the New York courts have. The case cited by Appellee, the husband's case, the officers told this person to stand back, and they weren't standing back. I mean, there's no case in the situation, and I won't say this is a unique situation, because I think it's not unique. Police officers, unfortunately, deal with situations of bystanders trying to intervene with the arrest. So this is not an uncommon kind of situation. And I think what the New York courts have made clear is there has to be some sort of obstruction, physical obstruction of what the officers are doing. And what we have here, there's nothing physical. Tapping someone on the shoulder is not a physical obstruction, or at least it's a question of fact. And this is not a situation where the officers are acting at their peril. This is something that happens, unfortunately, with some frequency, where they have to deal with bystanders who get upset. In a vacuum, tapping somebody on the shoulder, where nothing is going on. I certainly agree with that. When a police officer is making an arrest of someone who is resisting arrest, and then someone behind him taps him on the shoulder, even a light tap on the shoulder, when he's devoting his energies and his concentration to trying to arrest somebody who's resisting and is posing a menace to him, I'm not sure it's unreasonable for the police officer to view that as something that's interfering with his doing the job that he's trying to do. I agree, except I wouldn't accept the premise that you presented. This record shows, as the district court says, we don't know what O'Sullivan was doing. Your question assumes that he was physically in there trying to handcuff him. In fact, the record doesn't show that at all. And indeed, what O'Sullivan said was, I was trying to handcuff him and he tapped me and I turned, but other officers said he had nothing to do with this. He was standing there, yes, as your Honor has indicated, but that he was not physically involved. This is not a situation where he's down, bending down, trying to handcuff a man, and someone else taps him on the shoulder. According to the conclusion that the district court reached, the only thing we know is that he was there. Does it matter whether he was trying to handcuff him or not? I mean, say you have three officers who are trying to arrest a person who's violently, and I'm departing from the record here, violently resisting, and they're trying to overpower this person and get handcuffs on him, and one of them is essentially standing there ready to assist if his efforts are needed. Okay, well, we don't know. Would it not interfere if a bystander comes up and says, excuse me, sir, can I ask you a question? Can you say as a matter of, if the question is as a matter of law, under New York laws, that interference, I would say no. It's not as a matter of law, particularly in this situation, is that we don't know what O'Sullivan was doing other than the fact that he was there, because what was interesting is that his brother officer said he wasn't doing the things that you were suggesting, that he was, you know, he was an officer standing there. And I think what's critical here is the brevity. I mean, this lasted maybe a second or two. I mean, to say as a matter of law that this one- or two-second interaction is as a matter of law, arguably probable cause, when the person did nothing other than politely ask a question, tap him on the shoulder, when told to stand back or push back or basically told to stand back, obeys, I would say that does not create, as a matter of law, arguable probable cause to arrest someone for governmental or obstructing governmental administration. Thank you very much. Thank you. Thank you both. Very well argued. Thank you. That's the last argued case on the calendar, so I'll ask the clerk to adjourn court. Court is adjourned.